Nᴀᴛɪᴏɴᴀʟ Bᴀɴᴋ ᴏғ Nᴏʀᴛʜ Aᴍᴇʀɪᴄᴀ, Appellant, v Sʏsᴛᴇᴍs Hᴏᴍᴇ Iᴍᴘʀᴏᴠᴇᴍᴇɴᴛ, Iɴᴄ., et al., Respondents, et al., Defendants.

Second Department, August 13, 1979

APPEARANCES OF COUNSEL

*Cole & Deitz (Edward N. Meyer, Robert E. Kushner* and *Robert D. Lang* of counsel), for appellant.

*James M. La Rossa (Andrew B. Melnick* of counsel), for respondents.

### OPINION OF THE COURT

MARGETT, J.

In this foreclosure action where the plaintiff bank has been denied its application to enter a deficiency judgment, two issues are presented. (1) Was there evidence in the record sufficient to satisfy plaintiff's burden of establishing, prima facie, that the fair market value of the subject property, on the date of the auction sale, was less than the amount of the outstanding debt, and the amount of such fair market value? (2) If so, did defendant then meet its burden of establishing that the highest and best use of the property was for something other than what it was zoned?

The property is a parcel slightly exceeding 28 acres occupying 1,223,339 square feet in the Bay Terrace neighborhood of Bayside, Queens. The property is zoned M1-1, for light manufacturing use, and prior to 1973, was improved with over a dozen buildings which were used as a research facility by GTE

Laboratories, Inc. (GTE). The Bay Terrace neighborhood is residential in character with one-family, two-family and three-family residences, as well as low- and medium-rise and some high-rise apartments. The residents are mainly white collar, middle class persons.

In December of 1972, defendants Lawrence Rosano and Michael Newmark, builder-developers of high density residential projects, agreed with GTE to purchase the property through a nominee corporation, defendant Systems Home Improvement, Inc. (Systems), for the sum of $10 million.

Defendants obtained a $12 million mortgage from plaintiff to finance their purchase of the property. At the hearing on the motion for a deficiency judgment, plaintiff made an offer of proof that defendants perpetrated a fraud to secure that mortgage. Allegedly, defendants told plaintiff's loan officer, James Bloor, that the purchase price was $15 million, $5 million in excess of the actual price of $10 million, to secure the $12 million loan. Presumably, defendants used the $2 million mortgage money in excess of the purchase price for other ventures.

Newmark and Rosano anticipated that they would demolish the buildings then on the property and obtain a change in zoning to allow them to construct a high-rise residential development. After the consummation of the sale in 1973, most of the buildings were demolished. But defendants were unable to overcome numerous objections raised by the community to their project. Thus, the zoning remained as it had been —M1-1.

In 1974 Systems defaulted in the payments due on the mortgage and this action was commenced. On October 17, 1975 the property was put up at auction and was sold to plaintiff National Bank of North America (the Bank) for $9 million. There were no other bids for the property.

Between the years 1972 and 1973—when respondents contracted for and closed the purchase of the property—and the foreclosure sale in October, 1975, no improvements were made to the property.

The Bank thereafter moved for an order confirming the referee's sale and for a deficiency judgment against respondents in the sum of $5,982,616.85. Defendants opposed the Bank's motion, asserting that the Bank had failed to meet its statutory burden that "a mortgagee must on foreclosure bid in the property at a price that shall at least equal the market

value * * * or must go without any satisfaction of so much of the debt as equals the difference between the value as [subsequently] determined [by a court] and a lower price paid on a sale to a third party" *(National City Bank of N. Y. v Gelfert,* 284 NY 13, 21, revd on other grounds 313 US 221).

Special Term ordered that a hearing be held to determine the fair market value of the property as of the date of the auction sale. At that hearing, Harold N. Warsawer, an expert witness called by plaintiff, testified that the value of the property, if used for industrial purposes—as zoned—was $8 million. Mr. Warsawer examined the possibility that the property could have been rezoned for residential uses, and estimated that the value would have been $9.9 million had the property been rezoned to allow construction of two-family houses and a small shopping center on the site. However, he estimated that it would have taken three years to rezone the property and that the discounted value would have been $6.7 million.

Mr. Warsawer acknowledged that a regional shopping center would have been a permitted use on the site provided a special use permit were obtained. However, he felt that a regional shopping center would not have been feasible because (a) the population density in the immediate area was inadequate, (b) there was a good deal of competition from seven other large shopping centers within Queens and Nassau Counties, and (c) traffic patterns in the area provided inadequate access.

On cross-examination, Mr. Warsawer acknowledged that his estimates of fair market value were based upon hearsay information as to sales prices of other properties in Queens which he did not personally verify. He further acknowledged that he had not quantified his adjustment of the sales prices on those comparable properties for location and quality when he prepared his appraisal. Finally, Mr. Warsawer admitted that he based his estimate as to the length of time it would take to rezone the property on experiences he had with rezoning of properties in Connecticut and New Hampshire.

Defendants called two experts, both of whom testified that it would have been feasible to obtain a special permit for the construction of a regional shopping center. Leonard Rothkrug, a practicing attorney who devoted 95% of his practice to zoning cases within the five boroughs of New York City,

testified that he believed a special permit for such a regional shopping center could have been obtained within six months. Thomas J. Daly, a real estate broker, opined that such a permit could have been obtained within four to six months. If used for a regional shopping center, the value of the property would, in Mr. Daly's opinion, have been $15 million.

Mr. Rothkrug acknowledged that a regional shopping center would require at least two major tenants. However, the only testimony about any interest in the site came from Mr. Daly, who said that a shopping center developer with a Detroit organization told him he would be interested in "anything in Queens with a high, middle income area". The location of the site was not identified during that conversation—Daly simply told the developer that he had a 28-acre site in Queens which was "very well located." By contrast, Mr. Daly had spoken to someone from Macy's recently who said that organization was not interested in the property. Mr. Daly conceded that if a special permit for a regional center were not issued, the only feasible use for the property was light manufacturing, in which case it would be worth $9 million.

In denying so much of plaintiff's motion as sought a deficiency judgment for nearly $6 million, Special Term, in effect, found that plaintiff had failed to satisfy its burden of establishing, prima facie, the fair market value of the property. The court found that Mr. Warsawer's testimony was of no probative value. Furthermore, the court applied a Federal statute (US Code, tit 12, § 371, subd [a], par [1]) which forbids Federally chartered banks such as plaintiff from making loans which exceed 66⅔% of the appraised value of unimproved real estate. Applying a presumption that plaintiff had acted lawfully in making the $12 million loan, the court reasoned that plaintiff had appraised the property at $18 million. The issue of the highest and best use that could have been made of the property—i.e., whether it was reasonably foreseeable that a regional shopping center could have been constructed on the site—was never reached by the court.

We note at the outset that Special Term's reliance on section 371 (subd [a], par [1]) of title 12 of the United States Code was misplaced since the version of that section which was cited by the court was not yet in effect at the time of the loan. Respondents concede as much on this appeal. Nor would such a method of valuation be proper in any event since the appraised value at the time the loan was made in 1973 would

not necessarily reflect the value of the property in October, 1975, when the auction sale took place.

Subdivision 2 of section 1371 of the Real Property Actions and Proceedings Law provides that a deficiency judgment shall be granted in an amount by which the debt exceeds the "higher" of (1) the fair market value of the property "as of the date [the] premises were bid in at auction", or (2) the sale price of the property at auction. Here the debt is approximately $15 million. The sale price at the October 17, 1975 auction was $9 million. If, as plaintiff Bank contends, the fair market value on October 17, 1975 was $8 to $9 million, the Bank would be entitled to a deficiency judgment of nearly $6 million. On the other hand, if respondents succeeded in establishing that the highest and best use of the property was as a regional shopping center, the fair market value of the property would have to be pegged at $15 million. In the latter case, the difference between the amount of the debt and the fair market value as of the date of the auction sale, would be zero, and plaintiff would not be entitled to any deficiency judgment.

Both sides agree that in a case such as this, the initial burden is upon the plaintiff to establish, prima facie, the fair market value of the property as of the date of the auction sale. Both sides also agree that the burden then shifts to defendants to establish that the highest and best use of the property was something other than the use for which it was zoned on that date.

■ This is a correct statement of the law (see Real Property Actions and Proceedings Law, § 1371, subd 2; see, also, *Matter of City of New York [Shorefront High School—Rudnick]*, 25 NY2d 146) and one upon which plaintiff must prevail. *We reverse so much of the order as is appealed, and grant plaintiff's motion for leave to enter a deficiency judgment.* Special Term erred in holding that plaintiff did not make a prima facie showing that the property was worth $9 million or less. In determining whether plaintiff's initial burden was established, the court was obliged to consider all of the evidence, including the proof adduced by defendants. (See *Shaw v Lewis*, 55 Misc 2d 664, 665, affd 58 Misc 2d 1072; McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C1002:1, pp 415-416; see, also, *Bopp v New York Elec. Vehicle Transp. Co.*, 177 NY 33, 35.) Thomas J. Daly, one of the two expert witnesses called by defendants, testified that

if a regional shopping center were not built on the site, the only feasible use for the property would have been light manufacturing. The value of the land would have been $9 million in such case. Thus, even assuming that the testimony of plaintiff's expert, Mr. Warsawer, could be completely disregarded (and it is interesting to note that Messrs. Warsawer and Daly were substantially in accord in valuing the property for industrial purposes—$8 million versus $9 million) Mr. Daly's testimony established that the fair market value of the property, *as zoned,* was $9 million.

The question remains whether defendants satisfied their burden of proving that the highest and best use of the property was as a regional shopping center. In order to meet this burden, defendants were required to establish "as reasonably probable that the asserted highest and best use could or would have been made of the subject property in the near future" (see *Matter of City of New York [Shorefront High School—Rudnick],* 25 NY2d 146, 149, *supra).* The use must be "more than a speculative or hypothetical arrangement in the mind of" the party who advocates the existence of such use (see *Matter of City of New York [Shorefront High School—Rudnick], supra,* p 149; *Triple Cities Shopping Center v State of New York,* 26 AD2d 744, affd 22 NY2d 683).

On the basis of the evidence presented, it would be extremely speculative to find that the subject property could ever be sold for a regional shopping center. As noted above, Leonard Rothkrug, one of defendants' two expert witnesses, admitted that a regional shopping center would require at least two major tenants. The record is devoid of any evidence indicating any commercial interest in the site, save for Mr. Daly's statement that a shopping center developer in a Detroit organization advised that he would be interested in "anything in Queens with a high, middle income area". This very general conversation, in which the site was not even identified, stands in stark contrast to a specific inquiry to Macy's which resulted in a disclaimer of any interest in the site. It was certainly insufficient to establish a reasonable probability that the property could have been developed as a regional shopping center.

Since defendants failed to sustain their burden of proof in this regard, the fair market value of the property should be based on its zoned use—light manufacturing. The experts agreed that the property would have been worth $8 to $9

million if sold or developed for such use. Since the auction price was $9 million, plaintiff is entitled to the full amount of the deficiency judgment sought, no matter which of the two figures is the more accurate.

TITONE, J. P., MARTUSCELLO and MANGANO, JJ., concur.

Order of the Supreme Court, Queens County, dated March 10, 1978, reversed insofar as appealed from, on the law and the facts, with costs and the branch of plaintiff's motion which sought leave to enter a deficiency judgment is granted.